IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2021

## IN RE MATTHEW K. ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 19A183          W. Jeffrey Hollingsworth, Judge**

_____

### No. E2020-00773-COA-R3-PT[1]

_____

This consolidated appeal involves termination of parental rights in a case focusing on Zayne R., the minor child of Brittney R. ("Mother") and Joseph D., and Matthew K., the minor child of Mother and Joshua K. In June 2019, Mother's parents, Larry R. ("Grandfather") and Bertha R. ("Grandmother") (collectively, "Grandparents"), filed two petitions in the Hamilton County Circuit Court ("trial court"), seeking termination of Mother's parental rights, respectively, to Zayne R. and Matthew K. (collectively, "the Children"). The Children had previously been removed from Mother's custody and placed in the custody of Grandparents pursuant to an order entered by the Hamilton County Juvenile Court ("juvenile court"). Following a consolidated bench trial, the trial court granted Grandparents' termination petitions based upon its finding by clear and convincing evidence that Mother had abandoned the Children by failing to visit and by failing to financially support them during the statutorily determinative period. The trial court further found that it was in the Children's best interest to terminate Mother's parental rights. Mother has appealed. Discerning no reversible error, we affirm the trial court's final orders terminating Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY W. ARMSTRONG, JJ., joined.

Stephanie Rogers, Chattanooga, Tennessee, for the appellant, Brittney R.

Berry Foster, Chattanooga, Tennessee, for the appellees, Larry R. and Bertha R.

_____

[1] Upon review of the appellate records as transmitted from the trial court and a determination that the two cases were tried together and involved the same appellant and appellees, this Court entered a *sua sponte* order on October 30, 2020, consolidating the appellant's appeal in case number E2020-00774-COA-R3-PT with this appeal.

**OPINION**

**I. Factual and Procedural Background**

Zayne R. ("Zayne") was born in June 2007. On October 25, 2016, the juvenile court placed Zayne in the legal custody of Grandparents. At the time of trial, Zayne had remained in Grandparents' custody and care continuously since that date. Both Mother and Grandmother testified during the termination trial concerning the circumstances that precipitated the juvenile court's award of custody of Zayne to Grandparents. According to Mother, she had agreed for Grandparents to have custody of Zayne during a 2016 hearing because she was "not at a point financially or mentally" to take care of him.[2] Mother also stated that although she had informed the juvenile court that it was "in the best interest of [Zayne] for [Grandparents] to take care of him," she had intended this arrangement to be a temporary one.

Grandmother explained during the termination trial that she and Grandfather had initially pursued custody of Zayne when Mother's relationship with her then-boyfriend was not "going right and she appeared to be getting on drugs . . . ." Grandmother also testified that on June 5, 2016, Grandfather had received a phone call from Mother "ranting and raving" and asking them to come get Zayne. According to Grandmother, Mother had also sent her text messages indicating that she and Zayne were "living on the streets." Grandmother explained that they had "felt like Zayne was in a situation where it was becoming unsafe for him . . . ."

Mother related during the termination trial that the juvenile court had conditioned the return of Zayne to Mother's custody on her ability to obtain and maintain employment, a vehicle, and a stable residence for a period of six months. Grandmother testified that the juvenile court had determined that it would consider returning custody to Mother if she provided the court with proof of six months of steady employment and a stable residence, proof of ownership of a vehicle, a note from a psychiatrist stating that she could raise a child again, and a note from Zayne. Mother testified that the juvenile court had granted Grandparents a measure of discretion concerning Mother's visitation with Zayne.

Matthew K. ("Matthew") was born in July 2018. On October 16, 2018, the juvenile court placed Matthew in the legal custody of Grandparents. At the time of trial, he had remained in their custody and care continuously since that date. Grandmother testified concerning the circumstances leading to Grandparents' custody of Matthew. Mother and Mother's then-boyfriend had taken one of Grandfather's vehicles, and Grandparents did not hear from Mother for "a couple of months" until she called them from Alabama.

---

[2] Although the record does not provide a clear description of the juvenile court proceedings, it appears that the Children were placed in Grandparents' custody after the juvenile court granted Grandparents' petitions to adjudicate the Children dependent and neglected.

Grandmother further explained that Mother told her that the vehicle had broken down and that her boyfriend had left. Although the timeline is unclear from her testimony, Grandmother stated that Mother went into premature labor due to dehydration at some point following this trip to Alabama. When Grandmother visited Mother in the hospital, Mother admitted to recent drug use. After Matthew was born, and upon Grandparents' emergency petition, the juvenile court granted temporary custody of him to Grandparents.

At trial, Mother acknowledged that the juvenile court had ordered her to take a drug test before a custody adjudication with regard to Matthew. According to Mother, she did not submit to a drug test because she could not afford one. By the time of the "second court date," Mother was homeless and without a source of income. As a result, Mother did not attend the October 16, 2018 hearing, and Matthew remained in the custody of Grandparents. According to Grandmother, the juvenile court did not place any conditions on Mother's ability to regain custody of Matthew because she was not present during the hearing. Mother acknowledged during trial that she was not in a position to regain custody of Matthew at the time of the juvenile court hearing.

On June 4, 2019, Grandparents concomitantly filed in the trial court separate petitions seeking termination of Mother's parental rights concerning Zayne and Matthew (collectively, "the Petitions"). In the Petitions, Grandparents alleged the following statutory grounds for the termination of Mother's parental rights as to both Children: (1) abandonment by failure to visit the Children for a period of four consecutive months immediately preceding the filing of the Petitions; (2) abandonment by failure to make reasonable payments toward the support of the Children for a period of four consecutive months immediately preceding the filing of the Petitions; and (3) persistence of the conditions that led to the removal of the Children from Mother's custody.[3] The trial court in its final orders referred to the four-month statutory period as February 4, 2019 through June 3, 2019 ("Determinative Period"), and we determine that this is the correct statutory period. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085 at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing).

Proceeding initially without benefit of counsel, Mother filed responses to the Petitions on June 28, 2019, raising the affirmative defense of lack of willfulness relative to the ground of abandonment based on her failure to visit. According to Mother's response, Grandparents had prevented her from visiting the Children by addressing her requests to

---

[3] Grandparents also alleged in the Petitions statutory grounds warranting termination of Joseph D.'s parental rights to Zayne and Joshua K.'s parental rights to Matthew. On January 31, 2020, the trial court terminated both fathers' parental rights following a hearing conducted on December 4, 2020, at which neither father appeared. The trial court found that the fathers had each failed to respond in any way or contest any issue and that each had abandoned his child by failure to visit and support during the four months preceding the filing of the Petitions. Because the fathers are not parties to this appeal, our focus will remain on the facts relevant to the statutory grounds for termination of Mother's parental rights.

visit with responses such as: "We have to be somewhere tonight"; "Zayne has a ball game"; or "Not today Brittney, I have [a] doctor['s] [appointment]." Mother asserted that she currently had a job, stable housing, and a vehicle and that she was prepared to regain custody of the Children. Despite these changes in circumstance, Mother acknowledged during trial that she had never filed a petition for visitation or to regain custody of the Children, stating that she did not know she could file such petitions.

On August 28, 2019, Mother filed a motion requesting that the trial court appoint an attorney to represent her. By order entered September 26, 2019, the trial court appointed counsel to represent Mother upon determining that she was indigent. The trial court also appointed attorney Lucy C. Wright as a guardian *ad litem* ("GAL") to represent the interests of the Children.

The trial court conducted a bench trial on January 24, 2020, during which Mother and Grandparents testified. Mother presented testimony and exhibits demonstrating a considerable level of improvement in her life circumstances and stability. Mother testified that she had been living with her fiancé, T.B., in Rossville, Georgia, for the previous nine or ten months. Mother added that she and T.B. were leasing a home. In support, she presented a lease indicating that she and T.B. were co-lessees. Mother also testified that she had placed child locks on doors throughout the house and had obtained a crib in preparation for regaining custody of Matthew. In addition, Mother stated that she had a bed for Zayne, along with toys and books for the Children. Mother presented a video depicting the condition of her home, which corroborated her testimony in this regard. Mother added that she owned a vehicle jointly with T.B. as well and presented a certificate of title to the vehicle identifying T.B. and Mother as co-owners. Mother further pointed out that she had maintained employment as a "secretary/bookkeeper" at T.B.'s automotive business where she earned $250.00 per week while working thirty-eight to forty-two hours per week by the time of trial.

Mother reportedly sought mental health and drug treatment at Helen Ross McNabb in 2017. According to Mother, she was diagnosed with bipolar disorder and prescribed Abilify, which she was no longer taking. Mother further related that she traveled to Helen Ross McNabb every other week for two and one-half months, making a total of five visits. Mother added that the last time she had received treatment from Helen Ross McNabb was in October 2017. Mother explained that a Helen Ross McNabb staff member diagnosed her with bipolar disorder and reached "the conclusion that it was just because of all the stuff I had been through, the trauma I had been through that year, so we did a short-term plan and I went through the short-term plan and made it through that and I've been fine ever since." Mother indicated that she had not used drugs in more than two years and that no drug use occurred in her household.

In terms of visitation, Mother testified that she had visited the Children between ten and thirteen times during the Determinative Period. Mother emphasized: "I have visited

as much as my parents have allowed me to. They're usually too busy for me to see them or they've already got plans for the day, so it's been hard for me to see my children due to their schedule." Mother estimated that she had visited the Children forty times since they were first placed in Grandparents' custody and had written Zayne three or four letters during that time. Mother further stated that she had been to two of Zayne's Taekwondo sessions but had not been able to attend any of his baseball games because Grandparents had not notified her of when games were scheduled.

Mother presented several photographs evidencing her visits with the Children. The first photograph, depicting Mother and Matthew, was dated March 6, 2019. Mother related that the photograph was taken when she met Grandmother at Grandparents' rental house to retrieve some of the personal items that Mother had previously left. The second photograph was of the Children and was dated March 25, 2019. Mother stated that this photograph was made after she had asked Grandmother to bring the Children to her workplace, where they spent three or four hours. Another photograph depicted Mother holding Matthew at Zayne's birthday party on June 1, 2019. These were the only photographs proffered by Mother that had been taken during the Determinative Period. Mother presented additional photographs and one video establishing that she had visited with at least one of the Children approximately eight times from December 2018 to December 2019.

Mother also offered copies of several text conversations to evince her efforts to visit the Children. The first communication was sent from Mother to Grandmother on March 16, 2019, explaining the meaning of the Children's names and inquiring whether Zayne had received the Valentine's Day letter she had sent. A text conversation from April 7, 2019, consisted of Mother communicating at 12:06 p.m.: "Hey call me when you leave church we are at the flea market wanted to see if maybe wanted to come." Later, Mother texted again, this time at 4:51 p.m.: "Tell [Z]ayne to call me when you guys get a chance." Grandfather later responded at 5:11 p.m., stating, "I tell him to call you after church" and "We been busy all day."

Mother also proffered a text conversation dated May 19, 2019, reflecting that Grandmother had invited Mother to Zayne's twelfth birthday party. Another copy of a text conversation reflects that Grandmother had messaged Mother on June 7, 2019, asking if Mother could send any photographs that she might have taken during Zayne's birthday party. Mother responded by sending three photographs. A text conversation from June 24, 2019, evidenced that Mother had inquired of Grandmother whether she and Grandfather would be having a birthday party for Matthew. Grandmother responded with a date and time. The final text message, dated July 24, 2019, demonstrates that Mother contacted Grandfather, stating: "Hey I've been trying to call to come see the boys. I've got Matthew and [Z]ayne some stuff. Want to see them." Only three of these text conversations occurred during the Determinative Period. One reflected an attempt on Mother's part to see the Children.

As for financial support, Mother testified: "Every time [she] called or spoke to [Grandparents] they told [her] that they had everything taken care of." Mother related that she had provided baby food, formula, and cereal to Grandparents for Matthew on one occasion in February 2019 and that she had given Zayne a shirt, pants, and underwear and Matthew onesies at some point during the Determinative Period. Mother also articulated that she had provided Zayne between ten and fifty dollars every time she saw him and that she had presented the Children birthday and Christmas gifts every year.

According to Mother, she would give Zayne cash because Grandparents would not accept money from her. Mother claimed that she did not know she had to pay monthly support until Grandparents filed the Petitions. However, when she did learn that she was obligated to pay monthly support, she gave her attorney $100.00 to deliver to Grandparents in October 2019. Mother further testified, however, that because Grandparents would not accept the $100.00, she ended further attempts to offer payments. Regarding her ability to provide support, Mother explained that she had been making $250.00 per week since November 2018 and that she was neither incarcerated nor disabled during the Determinative Period.

Grandmother's trial testimony contradicted much of Mother's testimony. According to Grandmother, Mother visited the Children only four times during the Determinative Period. With respect to Matthew, Grandmother indicated that Mother had visited him approximately fifteen times rather than forty since Grandparents had obtained custody. Grandmother also stated that the first time Mother visited Matthew was when she appeared at Grandparents' home needing a place to sleep. According to Grandmother, the next occasion Mother saw Matthew was when Grandmother transported Mother to court. Grandmother related that she and Grandfather would not permit Mother to take Matthew unsupervised to an event called "the Enchanted Garden" due to her lack of previous visitation and Matthew's separation anxiety. Grandmother noted that this was the only time when Mother had requested to visit with Matthew outside Grandparents' home without their supervision. With respect to Zayne, Grandmother testified that Mother visited with him when (1) she brought the Children to see Mother at work on March 6, 2019; (2) Mother took Zayne to the flea market on April 21, 2019; and (3) Mother attended Zayne's birthday party on June 1, 2019.

Regarding support, Grandmother stated that Mother never offered to provide any type of support for the Children during the Determinative Period. Grandmother acknowledged, however, that Mother gave Zayne a birthday gift plus $15.00 or $20.00 on June 1, 2019. Similarly, Mother had provided the Children gifts in the past for birthdays and Christmas. However, Grandmother denied that she and Grandfather had rejected support from Mother, insisting: "We would not turn any help down from anybody." Grandmother also denied ever informing Mother that they did not need financial help, emphasizing that they had been fortunate to have received clothing for Matthew from

others.  Grandmother did express that in January 2019, Mother offered to assist, bringing four cans of formula and ten jars of baby food for Matthew and a pair of underwear for Zayne.

During trial, Grandfather acknowledged that Mother had "changed her life," stopped using drugs, and was "doing great."  In his opinion, however, Mother could not raise the Children.  Mother's counsel questioned Grandfather regarding whether he had contacted his sister, M.R. ("Aunt"), after he observed that Aunt was at the court hearing on December 4, 2019.  Although Grandfather confirmed that Aunt was present and that he had called her to inquire as to why, he denied ever instructing Aunt not to return to court.

Upon the conclusion of Grandparents' proof, Mother sought to call three rebuttal witnesses:  Aunt, T.B., and T.B.'s mother.  Opposing counsel objected on the basis that Mother's witness list was received the night before trial.  In turn, Mother's counsel asserted that the rebuttal witnesses were determined to be necessary only following Grandparents' testimony.  Counsel also emphasized that all of the rebuttal witnesses were known and had been present during the previous hearing on December 4, 2019.  Counsel for Grandparents countered, "I have no earthly idea who either of them were and . . . I haven't had the time to either ask them what they're going to talk about . . . ."  With reference to Rule 8.02(c) of the Eleventh Judicial District Local Rules of Civil Practice, the trial court ruled:

> [A]t least ten business days before trial[,] the parties shall file and serve by facsimile or by hand[:] a witness list[,] including names, addresses[,] and, if known, telephone numbers of all witnesses, including rebuttal witnesses. And the last time we were here you convinced me that you hadn't had time to get prepared and that was the reason, over objection and somewhat reluctantly on my part, to continue this matter because you convinced me that you hadn't had time to prepare, so we come in some two months later and we're getting the witness list the night before the hearing.  I'm not going to allow you to call these witnesses.  I just think under these circumstances I'd be just totally ignoring the local rules and even if Aunt Helen or whoever she is came in and said, [Grandfather] said what you said [Aunt] said, it's really not going to make much difference in this case.

Prior to the trial court's adjudication on the merits, the GAL reported that the Children were "doing great" and recommended that Mother's parental rights to the Children be terminated.  According to the GAL, Zayne "barely mentioned" Mother during their one-on-one interview, and he seemed to be thriving while in the custody of Grandparents.  In the GAL's estimation, this was a "last-ditch effort by mom" to regain custody of the Children.  Furthermore, the GAL elucidated:

> Once [Mother] knew that the writing was on the wall, she kind of came forth and tried to fight, but even then it causes me some concern that there wasn't

this big effort to fight. Even after she knew support was being alleged, that she didn't pay it. She still didn't pay it. She could have dumped stuff on the porch or put it in the bank and her saying that she's tried as hard as she can, it's not good enough for the kids and it's too late.

Upon the close of trial, the trial court orally dismissed Grandparents' claim that the conditions leading to the Children's removal persisted, noting: "Everybody agrees she's remedied conditions. That's not an issue." In addition, the trial court afforded Mother credit for the "tremendous progress" she had made. However, despite such progress, the trial court found that she had abandoned the Children through her failure to visit and pay support during the Determinative Period. Although the trial court noted that Mother had claimed by affirmative defense that Grandparents had prevented her from visiting the Children, the court determined Grandmother's testimony as more credible than Mother's and thereby discounted Mother's asserted defense.

In two final orders, one pertaining to each of the Children, the trial court found that Mother had visited the Children only four times over the course of the Determinative Period and that she had initiated only one of those visits. Significantly, the trial court concluded that these visits constituted token visitation. The trial court accordingly determined that Grandparents had presented clear and convincing evidence to support a finding that Mother had abandoned the Children by failure to visit during the Determinative Period.

The trial court further found that Mother had not raised an affirmative defense with respect to Grandparents' claim of abandonment by failure to pay support. Citing Tennessee Code Annotated § 36-1-102(1)(H), the trial court explained that every parent who is eighteen years or older is presumed to have knowledge of a legal obligation to support her children. Consequently, the trial court concluded that Mother's claim that she did not know she needed to provide support to the Children proved unavailing. Ergo, the trial court concluded that the ground of abandonment by failure to provide financial support for the Children during the Determinative Period had been proven by clear and convincing evidence. Furthermore, the trial court noted in each order that "the other grounds that may have been raised in the petition to terminate have either been waived or conceded that there was no basis for them."

Following an analysis of each best interest factor, the trial court determined by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. The trial court subsequently entered orders terminating Mother's parental rights respectively to Zayne and Matthew on May 4, 2020. Mother timely appealed.

## II. Issues Presented

Mother has raised the following issues on appeal, which we have restated slightly as follows:

1. Whether the trial court erred in preventing Mother from calling additional witnesses during trial.

2. Whether the trial court erred in finding by clear and convincing evidence that Mother had abandoned the Children by failing to visit and support them during the four months preceding the filing of the Petitions.

3. Whether the trial court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest.

## III. Standard of Review

Mother's first issue on appeal involves the exclusion of evidence and therefore must be reviewed under an abuse of discretion standard. *Hill v. Hill*, No. M2006-01792-COA-R3-CV, 2008 WL 110101, at *4 (Tenn. Ct. App. Jan. 9, 2008). As our Supreme Court has previously instructed:

> A trial court abuses its discretion by applying an incorrect legal standard or reaching an illogical or unreasonable decision that causes an injustice to the complaining party. In reviewing the trial court's exercise of discretion, we presume that the trial court's decision is correct and review the evidence in a light most favorable to upholding the decision. Discretionary decisions, however, require a conscientious judgment, consistent with the facts, that takes into account the applicable law.

*White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015) (internal citations omitted). Furthermore, "[c]oncluding that a trial court improperly excluded otherwise admissible evidence does not end the inquiry." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Unless the erroneous exclusion of the evidence would have affected the outcome of the trial, this Court will not reverse the judgment based on the trial court's evidentiary decision. *Id.*

The remaining issues address the trial court's decision to terminate Mother's parental rights. In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530

(Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182

- 10 -

S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). In addition, as our Supreme Court has explained, this Court is required "to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 525.

IV. Exclusion of Evidence

Mother contends that the trial court erred in precluding her three rebuttal witnesses from testifying during trial, predicated on her failure to comply with Eleventh Judicial District (Hamilton County) Local Rule of Civil Practice 8.02(c) requiring parties to file and serve a witness list at least ten business days before trial. Mother specifically argues that (1) the trial court could not have undertaken "the thorough fact-finding" process required for parental termination hearings based solely on the parties' testimonies, particularly considering that all rebuttal witnesses would have had information relevant to the grounds of abandonment and best interest of the Children; (2) the trial court could have imposed a sanction less harsh than barring the testimony of the three witnesses; (3) Grandparents were not unfairly disadvantaged by the late notice and had "implicit and explicit notice of the witnesses" because the witnesses were present in the gallery during the December 4, 2019 hearing and Grandparents knew each witness; and (4) Mother was not afforded a fundamentally fair procedure due to the trial court's ruling preventing these witnesses from testifying at trial.

Grandparents initially argue that Mother waived this issue by failing to cite relevant authority in the argument section of her appellate brief in accordance with Tennessee Rule of Appellate Procedure 27(a)(7). With respect to Mother's substantive claim, Grandparents posit that the burden was upon Mother to comply with the local rules and that the trial court acted within its proper authority to enforce them.

## A. Waiver

As a threshold matter, we will first address Grandparents' argument that Mother's failure to comply with Rule 27(a)(7) serves as a waiver of Mother's contention that the trial court erred by enforcing Local Rule 8.02(c) and thereby prohibiting Mother's rebuttal witnesses from testifying. Rule 27(a) provides in pertinent part:

(a)     Brief of the Appellant. The brief of the appellant shall contain under appropriate headings and in the order here indicated:

* * *

(7)     An argument, which may be preceded by a summary of argument, setting forth:

(A)     the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on[.]

Although Mother prefaces her postulate with language from *In re Malik G.* describing a parent's entitlement to fundamentally fair procedures in termination proceedings, she fails to provide specific authority for any of her contentions regarding the trial court's enforcement of Local Rule 8.02(c). *See In re Malik G.*, No. E2019-01040-COA-R3-PT, 2019 WL 6245483, at *10 (Tenn. Ct. App. Nov. 21, 2019). This Court has previously concluded that "[f]ailure to cite to relevant authority constitutes a waiver of the issue." *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 105 (Tenn. Ct. App. 2001); *see also City of La Vergne v. LeQuire*, No. M2016-00028-COA-R3-CV, 2016 WL 6124117, at *2 (Tenn. Ct. App. Oct. 19, 2016) ("Tennessee courts have routinely held that the failure to cite relevant authority in compliance with that rule constitutes a waiver of the issue.").

Nevertheless, this Court may exercise its discretion to "suspend or relax the procedural rules in a given case for good cause." *City of La Vergne*, 2016 WL 6124117, at *2 (citing Tenn. R. App. P. 2). In addition, "[t]he *Tennessee Rules of Appellate Procedure* should be construed to afford all parties a hearing on the merits." *Paehler v. Union Planters Nat'l Bank*, 971 S.W.2d 393, 397 (Tenn. Ct. App. 1997) (deciding the appeal on the merits despite acknowledging that the appellant failed to comply with Rule 27); *see also* Tenn. R. App. P. 1 ("These rules shall be construed to secure the just, speedy, and inexpensive determination of every proceeding on its merits.").

Given the significant interests at stake in the instant case, we will address Mother's initial issue despite her failure to cite relevant authority in support of her contentions. Furthermore, Grandparents have not claimed that they would be unfairly prejudiced by our consideration of this question, and Mother's argument is not so substantially unclear as to impede our ability to address it. *See City of La Vergne*, 2016 WL 6124117, at *2 (finding good cause to decide the merits of the appeal when the deficiencies in the appellant's brief did not impede this Court's ability to do so, the appellant's argument was clear, and the appellee did not claim that it would be unfairly prejudiced). We will therefore consider the merits of Mother's first issue.

### B. Fundamentally Fair Procedure

Although Mother's position is not entirely clear, we discern two primary arguments with regard to the trial court's enforcement of its local rule and exclusion of witness testimony. First, Mother ostensibly argues that the trial court's enforcement of Local Rule 8.02(c) and its resultant decision to exclude the testimony of her witnesses impaired her ability to receive a fundamentally fair termination proceeding. Moreover, although Mother never references the phrase, "abuse of discretion," she also appears to argue that the trial court abused its discretion by prohibiting her witnesses from testifying, particularly when these witnesses could have offered evidence relevant to the grounds for termination and the best interest of the Children.

The question of whether a trial court's exclusion of rebuttal witnesses' testimony renders a parental termination proceeding fundamentally unfair appears to be a matter of first impression for this Court.[4] Mother provides no authority for her contention that the trial court's enforcement of its local rule and exclusion of rebuttal witnesses' testimony rendered the termination trial fundamentally unfair. We likewise have found no such authority. Upon careful review, we determine that the trial court's decision to exclude the evidence did not render the termination trial fundamentally unfair.

A parent's right to the care and custody of her children is "among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). However, the contours of due process have not always been clear. As the United States Supreme Court noted in *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, "'due process' has never been, and perhaps can never be, precisely defined," and it is "not a technical conception with a fixed content unrelated to time, place, and circumstances." 452

---

[4] This Court addressed whether a trial court abused its discretion when it precluded a parent's rebuttal witness from testifying at trial due to the parent's failure to include the rebuttal witness on her filed witness list in *Hill*, 2008 WL 110101, at *4. However, *Hill* involved the modification of a child custody plan between two parents. Unlike the case at bar, it did not embrace the irrevocable deprivation of a parent's right to the "companionship, care, custody, and management" of her children. *See Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 27 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).

U.S. 18, 24 (1981) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Nevertheless, it is clear that the concept of due process "expresses the requirement of 'fundamental fairness.'" *Lassiter*, 452 U.S. at 24.

Beyond the essential requirements of notice and an opportunity to be heard in a meaningful time and manner, *see In re Carrington H.*, 483 S.W.3d at 534, fundamental fairness is also difficult to precisely define, *see Lassiter*, 452 U.S. at 24 (noting that "fundamental fairness" is a "requirement whose meaning can be as opaque as its importance is lofty"). However, the United States Supreme Court has delineated three elements to balance when determining exactly what due process requires of courts. Those three factors are as follows:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Although we have located no Tennessee appellate decision addressing this particular question, and as a result no Tennessee decision applying these elements to this specific issue, the Michigan Court of Appeals has done so in a decision, *In re S.M.*, that we discern to be instructive and persuasive. *See In re S.M.*, No. 220706, 2000 WL 33389746 (Mich. Ct. App. Dec. 26, 2000); *see also Summers Hardware & Supply Co. v. Steele*, 794 S.W.2d 358, 362 (Tenn. Ct. App. 1990) ("Cases from other jurisdictions . . . are always instructive, sometimes persuasive, but never controlling in our decisions."). We therefore will address in turn each due process element as applied to the facts of this case.

### 1. Private Interest Affected

The private interest at stake in this action is one of great significance and constitutional import because a parent's right to the care and custody of her children is a fundamental and "recognized liberty interest[]." *In re Audrey S.*, 182 S.W.3d at 860. Moreover, the United States Supreme Court has explained that "a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter*, 452 U.S. at 27 (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). The termination of a person's parental rights has been described by the United States Supreme Court as a "unique kind of deprivation," *Lassiter*, 452 U.S. at 27, and recognized as "final and irrevocable," *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). By reason of the magnitude of the termination of parental rights, a "parent's interest in the accuracy and justice of the decision to terminate his or her parental status is,

therefore a commanding one." *Lassiter*, 452 U.S. at 27. As such, the stakes involved for Mother are "profoundly high" and would weigh in favor of a finding that the preclusion of Mother's rebuttal witnesses' testimony rendered the termination proceeding fundamentally unfair. *In re Audrey S.*, 182 S.W.3d at 861.

### 2. Risk of an Erroneous Deprivation of Private Interest

The second element to be considered is the risk that Mother would be erroneously deprived of her interest in the care and custody of the Children through the procedure used. In this case, the procedure relates to the trial court's enforcement of its local rule and consequent exclusion of testimonial evidence. Whether the trial court risked erroneously depriving Mother of her parental rights fundamentally depends on whether the testimony of her witnesses could have affected the outcome of the trial.

We note that the question of a risk of erroneous deprivation of Mother's parental rights is significantly impacted by Mother's failure to make an offer of proof at trial in compliance with Tennessee Rule of Evidence 103(a). This failure ordinarily renders the issue waived. *See Hill*, 2008 WL 110101, at *5 ("Generally, the appellate courts will not consider issues relating to the exclusion of evidence when this tender of proof has not been made."). Tennessee Rule of Evidence 103(a) provides:

> (a)    Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> \* \* \*
>
> > (2)    *Offer of Proof.* In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

Therefore, we generally cannot assign error to the trial court's exclusion of evidence if the party failed to offer the trial court the substance of the evidence. *Hill*, 2008 WL 110101, at *5. A party may make an offer of proof by "presenting the actual testimony, stipulating the content of the excluded evidence, or presenting a summary, oral or written, of the excluded evidence." *Id.* In *Hill*, this Court decided that it could not determine whether the trial court's erroneous exclusion of a parent's rebuttal witness testimony at a trial involving modification of custody had affected the outcome of the trial because the mother had not submitted an offer of proof. *Id.* at *6. The *Hill* Court concluded in pertinent part:

An erroneous exclusion of evidence, however, does not require reversal unless we can determine the evidence would have affected the outcome of the trial had it been admitted. The appellate courts cannot make such a determination without knowing what the excluded evidence would have been.

*Id.* at *5 (internal citations omitted).

In Tennessee, two exceptions exist relative to the requirement for parties to make an offer of proof. *Id.* One exception is provided by the rule itself, stating that error may be found if "the substance of the evidence and the specific evidentiary basis supporting admission . . . were apparent from the context." Tenn. R. Evid. 103(a)(2). The remaining exception derives from this Court's adoption of an exception expounded in *First Nat'l Bank & Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1305 (8th Cir. 1991), and occurs when the "exclusion of evidence seriously affects the fairness of the trial." *Hill*, 2008 WL 110101, at *5 (citing *First Nat'l Bank & Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1305 (8th Cir. 1991)). Considering the question before us, we determine that neither exception applies to our analysis.

Regarding the first exception, although we find that a portion of Aunt's testimony was apparent from the context, this is insufficient to cure Mother's failure to make an offer of proof. Based on Mother's counsel's questioning of Grandfather, it appears that Mother was intending to call Aunt to testify that Grandfather had contacted her and asked her not to testify on Mother's behalf. This is the only substance of expected testimony from any of the three witnesses that is apparent from the context at trial. Although Mother's counsel informed the trial court that she needed to "have additional testimony to rebut claims that were made and statements that were made here on the record" and included in her appellate brief that these rebuttal witnesses had "relevant information related to the grounds for termination and a best interest analysis," these broad statements do not constitute a sufficient offer of proof and do not illuminate the substance of what these witnesses' testimony would have been at trial.

In the absence of an offer of proof, we have been provided no foundation upon which to analyze whether the exclusion of Mother's witnesses' testimony would have affected the outcome of the trial and thereby placed Mother's parental rights at risk of being erroneously terminated. Although we could surmise that these witnesses would have offered relevant information to specifically rebut Grandmother's claims regarding visitation and Grandmother's denial that she and Grandfather prevented Mother from visiting the Children, Mother's counsel did not proffer that evidence. Consequently, we will not presume that the testimony of Mother's rebuttal witnesses would have affected the outcome of the trial or that the trial court's decision to prohibit these witnesses from testifying created a risk of erroneous deprivation of Mother's parental rights.

As noted previously, we find the Michigan Court of Appeals' decision in *In re S.M.*, a parental termination case, persuasive concerning this query. 2000 WL 33389746. The trial court in *In re S.M.* excluded testimony from the father's witnesses because he filed a witness list after the trial court's deadline and failed to include sufficient information for the opposing party to investigate the witnesses. *Id.* at *1. The trial court rejected the father's request for a one-week adjournment, citing the court's "congested docket, the risk of violating the six-month rule of MCR 5.972,[5] and the inconvenience to the children's mother . . . who had traveled to the court from North Carolina." *Id.* at *1. In determining whether the trial court's enforcement of its scheduling order and exclusion of the evidence violated the due process requirements for a termination proceeding, the appellate court considered the due process elements enumerated in *Lassiter* and *Mathews*. *Id.* at *3.

The Michigan appellate court ultimately concluded that there was no risk of an erroneous deprivation of the father's parental rights considering that the father's witnesses were all character witnesses, they did not observe the incidents that the petitioner alleged, and they would have "offered little support to respondent's defense . . . ." *Id.* In sum, the father could not show that the outcome of the trial would have been different had the trial court permitted him to present the witnesses. *Id.* Inasmuch as Mother failed to make an offer of proof before the trial court in the instant action, we determine that she similarly cannot demonstrate that the outcome of the trial would have been different or that the trial court risked erroneously terminating her parental rights.

This second element also includes the probable value of additional or substitute procedural safeguards. One such potential safeguard was a continuance, which would have avoided unfairness to Grandparents by affording them time to adequately prepare to cross-examine the rebuttal witnesses while allowing Mother to present her witnesses at a later date. Although Mother suggests in her appellate brief that the trial court could have continued the trial for another ten business days in order to render Mother's witness list compliant with Local Rule 8.02(c), she did not request a continuance at trial. Mother also failed to ask for a recess during which to provide opposing counsel additional time to prepare. Mother failed entirely to propose a substitute procedural safeguard to the exclusion of her witness testimony. *See Bank of Fayette Cty. v. Woody*, No. W2010-01798-COA-R3-CV, 2011 WL 2572052, at *3 (Tenn. Ct. App. June 30, 2011) ("[T]here is insufficient evidence in the record to show that the trial court abused its discretion in failing to grant a continuance . . . especially when no request for continuance was made."). In any event, even had Mother proposed an alternative to the trial court's exclusion of her witnesses' testimony, without knowing the substance of this evidence, we cannot determine what, if any, value this additional procedural safeguard would have had on the trial.

---

[5] Like Tennessee, Michigan requires courts to hold the trial on the petition to terminate parental rights within six months after the filing of the petition. *See* Tenn. Code Ann. § 36-1-113(k).

Notwithstanding the absence of an offer of proof from Mother, we can discern to some degree that there was little risk of an erroneous deprivation of Mother's parental rights because her own testimony supported the trial court's findings that she had failed to support the Children during the Determinative Period and failed to counter Grandparents' claims that Mother's visitation with the Children was anything more than token.[6]  With regard to her failure to support, Mother acknowledged that she did not provide regular support to the Children when she proffered that she was unaware she had an obligation to do so.  Mother has failed to explain how additional testimony from other witnesses would have affected the trial court's conclusion that Mother failed to provide support during the Determinative Period when her own testimony confirmed such failure.

Concerning her failure to visit, Mother testified that she had visited the Children between ten and thirteen times during the Determinative Period and that she would have visited more regularly had it not been for Grandparents' obstruction.  However, in contrast to Grandmother, Mother did not provide specific dates and could only testify that she "probably" visited the Children a certain number of times in February and May of 2019.  In addition, Mother presented only one text message conversation occurring during the Determinative Period reflecting an unsuccessful attempt, and her only attempt, to schedule a visit with the Children on the same day, affording Grandparents little advance notice.

Therefore, inasmuch as Mother's own testimony and documentary evidence did not rebut the trial court's findings that she had failed to support the Children and failed to engage in more than token visitation with them, we determine that there was little risk that the trial court would erroneously deprive Mother of her parental rights by declining to allow her to present testimony by her rebuttal witnesses in violation of the court's local rule.

### 3.  Government's Interest

The third element to be considered is the government's interest, "including the fiscal and administrative burdens that the additional or substitute procedures would entail." *Mathews*, 424 U.S. at 321.  In this case, the trial court maintained a responsibility to protect a stated government interest in an expeditious adjudication for the benefit of the Children. As our Supreme Court has previously noted:

> In parental termination proceedings, the burdens of extended litigation fall most heavily upon children—those most vulnerable and most in need of protection, stability, and expeditious finality.  "There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged."  "Due to the immeasurable

---

[6] We will address the statutory grounds for termination in depth in a subsequent section of this Opinion.

damage a child may suffer amidst the uncertainty that comes with such collateral attacks, it is in the child's best interest and overall well[-]being to limit the potential for years of litigation and instability."

*In re Carrington H.,* 483 S.W.3d at 533 (internal citations omitted). This interest in "expeditious finality" is also codified in Tennessee Code Annotated § 36-1-113(k) (Supp. 2020), which provides:

> The court shall ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child. The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing. If such a case has not been completed within six (6) months from the date the petition was served, the petitioner or respondent shall have grounds to request that the court of appeals grant an order expediting the case at the trial level.

In addition, the General Assembly has expressly stated its intent that "the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties . . . ." Tenn. Code Ann. § 36-1-124(c) (Supp. 2020).

Notably, this Court has previously rejected a parent's due process claim based on the trial court's denial of her second request for a continuance to allow her more time to travel from out of state to appear at the trial and its subsequent rejection of her request to testify via telephone. *See In re D.T.*, No. E2017-00051-COA-R3-PT, 2018 WL 2357655, at \*5-7 (Tenn. Ct. App. May 24, 2018). As a result of the mother's failure to appear at the trial and the trial court's denial of her request to testify telephonically, the mother did not testify. *Id.* at \*3. However, instead of concluding that the trial court's procedural and scheduling rulings violated the mother's right to a fundamentally fair termination proceeding, this Court determined that she had been the author of her own misfortune, noting that "[o]ther than her own shortcomings, the record indicates nothing that would have prevented mother from attending trial." *Id.* at \*5. In reaching this conclusion, this Court cited the trial court's findings that the mother had "ample notice of the trial date," "was well aware of the purpose of the proceedings," and had "sufficient income" to "effectuate any travel plans." *Id.* Similarly, in the case at bar, Mother bore responsibility for her failure to timely identify witnesses by waiting until the day before trial to notify the opposing parties that she planned to call three rebuttal witnesses.

Finally, we note that "Tennessee court rules, statutes, and decisional law are already replete with procedures, some previously described herein, designed to ensure that parents receive fundamentally fair parental termination proceedings." *In re Carrington H.*, 483 U.S. at 533. We decline to add to these protections the requirement that trial courts must

disregard their local rules, as well as a party's failure to comply with said rules, in order to ensure that parents can present rebuttal witnesses, particularly when the party had ample time to comply with the local rules and then failed to afford herself of procedural safeguards at trial by failing to make an offer of proof or request a continuance.

Moreover, Tennessee Rule of Appellate Procedure 36(a) provides: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Mother was responsible for failing to provide the opposing side with a witness list by the deadline prescribed by the local rules after being granted a nearly two-month continuance at her request. Not only did Mother fail to avail herself of procedural safeguards in the trial court, she also failed to preserve any objection or provide this Court with sufficient proof to properly evaluate her due process claim. Considering in total that Mother failed to establish that a risk existed that the trial court would erroneously deprive her of her parental rights, the trial court maintained a responsibility to protect a clear government interest in an expeditious adjudication, and Mother failed to request any substitute procedural safeguard, we hold that Mother's termination proceeding was fundamentally fair.

## C. Abuse of Discretion

Having concluded that the trial court's preclusion of witness testimony did not violate Mother's right to a fundamentally fair termination proceeding, we now must determine whether the trial court's exclusion of evidence constituted an abuse of discretion. It is a long-standing principle that "trial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001); *see Pennington v. Pennington*, No. M2007-00181-COA-R3-CV, 2008 WL 1991117, at *3 (Tenn. Ct. App. May 7, 2008) ("Trial courts have broad discretion with respect to the admission or exclusion of evidence and the enforcement of local rules.").

Our Supreme Court, in describing this standard, has instructed:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (internal citations omitted).

Ordinarily, when determining the proper sanction for a party's failure to name a witness on a witness list, trial courts should consider:

the explanation given for the failure to name the witness, the importance of the testimony of the witness, the need for time to prepare to meet the testimony, and the possibility of a continuance. In the light of these considerations, the court may permit the witness to testify, or it may exclude the testimony, or it may grant a continuance so that the other side may take the deposition of the witness or otherwise prepare to meet the testimony.

*Pennington*, 2008 WL 1991117, at *3 (*quoting Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981)).

In *Pennington*, the trial court had excluded the testimony of the mother's witnesses, other than herself, proffered during a hearing concerning modification of custody because she had failed to comply with the local rule mandating that parties exchange the names of witnesses at least seventy-two hours in advance of trial. *Id.* at *3. The mother presented an offer of proof for only one witness's testimony. This Court ultimately concluded that the trial court had erred by not considering all of the relevant factors regarding this witness. *Id.* at *5. However, this Court further determined that the trial court had not abused its discretion by excluding the testimony of the mother's other witness because she had made no offer of proof with regard to that witness's testimony. *Id.*

Similarly, as previously reviewed, Mother did not make an offer of proof concerning the testimony of any of her rebuttal witnesses. Therefore, we cannot ascertain the substance of the testimony or determine that it would have affected the outcome of the trial had it been admitted. Inasmuch as Mother failed to submit an offer of proof for the rebuttal witnesses, we determine that the considerations outlined in *Pennington* are of limited relevancy in the present case. Therefore, as in *Hill*, *see* 2008 WL 110101, Mother has been unable to show that the testimony of her witnesses would have affected the outcome of the trial. Consequently, we discern no abuse of discretion in the trial court's exclusion of such evidence.

V. Statutory Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2020) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship

rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)    Termination of parental or guardianship rights must be based upon:

    (1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

    (2)    That termination of the parent's or guardian's rights is in the best interests of the child.

In its final orders, the trial court concluded that the evidence clearly and convincingly supported a finding of two statutory grounds to terminate Mother's parental rights: abandonment by failure to visit and abandonment by failure to support pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and -102(1)(A). We will address each statutory ground in turn.

## A. Abandonment by Failure to Visit

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides, as relevant to this action:

(g)    Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

    (1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1) (Supp. 2020) provides in relevant part:

(A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or

- 22 -

guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child; . . .

In determining that clear and convincing evidence existed demonstrating Mother's failure to visit with the Children during the applicable four months, the trial court specifically found that Mother visited the Children only four times during the Determinative Period and that only one of those visits had been initiated by her. The trial court also found that Grandmother's testimony denying that she and Grandfather had prevented Mother from visiting the Children was more credible than Mother's testimony claiming otherwise. Mother contests the trial court's finding that her visits with the Children were nothing more than token visitation and argues that "she was prevented from having more regular and an increased number and duration of visits by [Grandparents]." We conclude, however, that the trial court did not err in determining that Mother had abandoned the Children by failing to visit them.

Mother contends that she carried her burden of proving that her failure to visit the Children was not willful but rather the result of Grandparents' obstructive conduct. According to Tennessee Code Annotated § 36-1-102(1)(I), a showing on behalf of the parent that her failure to visit was not willful is an affirmative defense to abandonment. The parent bears the burden of proving this affirmative defense by a preponderance of the evidence. Tenn. Code Ann. § 36-1-102(1)(I). As previously explained by this Court, "willfulness" does not require the same standard of culpability as is required by the criminal code, and it does not require "malevolence or ill will." *In re Audrey S.*, 182 S.W.3d at 863. Rather "[w]illful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent," and such conduct is the "product of free will rather than coercion." *Id.* Furthermore, a parent's failure to visit is "not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child . . . ." *Id.* at 864 (internal citations omitted). Conduct that would amount to a significant restraint or interference with a parent's ability to visit includes "blocking access to the child," "keeping the child's whereabouts unknown," and "vigorously resisting a parent's efforts to visit the child." *Id.* at 864, n.34.

Accordingly, Mother was required to prove during trial that Grandparents had "actually prevent[ed]" her from visiting the Children or significantly restrained or interfered with her efforts to do so. *Id.* at 864. To that end, Mother testified that she had visited the Children as frequently as Grandparents had allowed. According to Mother, Grandparents were "usually too busy for [her] to see [the Children]." Mother also testified that when she would contact Grandmother to visit the Children, Grandmother's response would be "she's too busy," "[t]hey're going out of town," "they don't have time," or "they already have plans." Mother insisted that as a result of Grandparents' busy schedule, it had been difficult for her to visit the Children. Mother asserted that her visits with the Children

- 23 -

would last "[a]s long as [Grandparents] allowed."  When questioned whether she had any text messages from Grandparents stating that "we're not going to let you see the kids," Mother claimed that she had "a bunch of them" but that they were on a phone that she had broken.[7]

Grandmother denied ever having informed Mother that she could not see the Children.  She added that Mother decided when visits were concluded.  According to Grandmother, "the only time [Grandparents] told her no on anything" was when Mother wanted to take Zayne and Matthew to an event known as "the Enchanted Garden."  Grandmother explained that they did not permit her to take Matthew because he was experiencing "really bad attachment anxiety" and that Mother had not been with him enough to make him feel comfortable without Grandparents present.  When asked whether she had ever allowed Mother to take Matthew anywhere alone, Grandmother responded that Mother had "never asked.  That was the first time she's ever asked."

Grandmother further elaborated, "If [Mother] would come to visit and get to know Matthew, we would have no problem with her taking him, but we are not going to send a baby with somebody that he does not know."  In an apparent reference to the latter half of 2018, Grandmother explained that Mother would "call every once in a while," requesting Grandparents to bring Matthew to visit her and Joshua (Matthew's father).  However, Grandparents "felt like it was [Joshua's and Mother's] duty to put in a little effort to come and see us because, you know, everything seemed to be falling on us to do it and they never come to see him."

Grandmother further testified that she had invited Mother to Zayne's sporting events and Taekwondo sessions but could not remember an occasion when Mother asked to attend any.  Grandmother acknowledged that it could be difficult scheduling visits with Mother without advance notice due to Zayne's many extracurricular activities.  Zayne was involved in baseball and basketball, played trombone, participated in Taekwondo, and went to church on Wednesdays and Sundays, all of which made unplanned visits difficult to arrange.

We determine that Grandparents' busy schedule, seemingly due in large part to Zayne's numerous extracurricular activities, did not constitute a significant restraint on or interference with Mother's ability to visit the Children so as to constitute a viable defense to Mother's failure to visit.  Although Mother relies on *In re Adoption of A.M.H.* in support of her position, we find that the antagonistic relationship between the guardians and parents in that case was markedly different from the relationship between Mother and

---

[7] In Mother's filed answers to the Petitions, she never alleged that Grandparents explicitly forbade her from visiting the Children.  The allegations in Mother's answers amounted to a claim that she had been unable to visit the Children as a result of Grandparents' busy schedules.  Mother acknowledged in her answer to the petition regarding Matthew that Grandparents had told her that she could come see the Children any time.  However, she averred that the "day never happens" due to Grandparents' busy schedules.

Grandparents here.  In *Adoption of A.M.H.*, the guardians of the child called the police in response to the parents' attempt to visit the child, and the parents were told not to return upon threat of arrest.  215 S.W.3d 793, 801 (Tenn. 2007).  In addition, during the determinative period, the parents "actively pursued legal proceedings to regain custody of A.M.H. . . . ."  *Id.* at 810.  As a result of this explicit example of prevention, restraint, and interference, this Court concluded that the parents had not willfully abandoned their child "[w]here . . . the parents' visits with their child have resulted in enmity between the parties and where the parents redirect their efforts at maintaining a parent-child relationship to the courts . . . ."  *Id.* at 810.  In the case at bar, Mother never filed a petition for visitation, petition to regain custody, or action concerning Grandparents' alleged obstruction.  Furthermore, the type of interference that Mother alleges contrasts with the type and seriousness of the interference present in *Adoption of A.M.H.*

Mother's circumstances also differ from the facts of *In re Mattie L.*, 618 S.W.3d 335, at 350-51 (Tenn. 2021), where our Supreme Court concluded that the mother had interfered with the father's ability to visit their child.  In that case, the mother had sent emails to the father declaring "no money, no kid" in reference to the father's failure to pay child support.  *Id.* at 349.  Evidence also demonstrated that the mother had violated the trial court's visitation order; refused to respond to emails and text messages from the father; refused to provide the father the address where she, the stepfather, and the child lived; directed the child's school to deny the father access to the child; and sometimes blocked the father's phone number.  *Id.* at 351.  Mother presented no evidence of similar interference or obstructive tactics in the case at bar.  The circumstances establishing prevention, restraint, or interference, which were present in *In re Adoption of A.M.H.* and *In re Mattie L.*, do not exist in this case.

Instead, the evidence presented at trial supports a determination that Mother's inability to visit with the Children stemmed from her failure to make reasonable efforts to arrange visitation by affording Grandparents' advance notice of the days she desired to visit the Children, particularly in light of Zayne's numerous extracurricular activities.  *See In re S.Y.*, 121 S.W.3d 358, 369 (Tenn. Ct. App. 2003) (concluding that the children's guardian did not bear the "sole burden for maintaining contact with the parent and organizing visitation schedules" but that the parent had "a duty to make every reasonable effort to arrange and insist upon visitation with her children").  For example, Mother's lack of reasonable effort to arrange and insist upon visitation is evinced by the text message conversation Mother presented from April 7, 2019.  Specifically, Mother texted Grandfather at approximately noon while she visited a flea market, asking whether Grandparents and the Children would like to come to the flea market as well.  Grandfather responded to the text around 5:00 p.m., indicating that they had been busy all day.  Grandparents' failure to dismiss their Sunday plans to join Mother at a flea market without any advance notice does not constitute the form of prevention, significant restraint, or interference contemplated by Tennessee Code Annotated § 36-1-102(1)(I).

Mother has also cited *In re Keri C.*, 384 S.W.3d 731 (Tenn. Ct. App. 2010), in support of her contention that Grandparents' actions rendered Mother's failure to visit not willful. Mother asserts that, unlike Grandparents, the guardians in *In re Keri C.* had accommodated the mother's ability to visit. According to Mother, the guardians of the child in *In re Keri C.* had "welcomed Mother into their home, invited Mother to Keri's birthday party, invited Mother to lunch, and at times invited Mother to attend church with the family." We note, however, that the evidence in the instant action established that Grandparents had welcomed Mother into their home on numerous occasions and had invited her to both of the Children's birthday parties. Moreover, Grandparents had invited Mother to celebrate holidays and had invited Mother to attend Zayne's 2018 Christmas concert, church with them as a family, and a therapy session for Zayne. Mother's reliance on *In re Keri C.* is unavailing. Following our thorough review of the proof presented, we conclude that Mother failed to demonstrate a significant restraint on or interference with Mother's ability to visit the Children so as to constitute a viable defense to Mother's failure to visit.

We now turn to the trial court's finding that Mother's visits constituted token visitation. "Token visitation" is visitation that "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). Whether a parent's visitation with her child is merely token in nature is a "fact-intensive inquiry" and requires us to "examine the frequency, duration, and quality of the visits that occurred." *In re Keri C.*, 384 S.W.3d at 748-50.

At trial, Mother related that she had visited the Children "probably two or three" times in February 2019, two or three times in March 2019, three or four times in April 2019, "probably twice" in May 2019, and once in June 2019. She added that each visit lasted between one and five hours. Grandmother, on the other hand, testified that Mother had visited the Children only four times during the Determinative Period. These occasions occurred when (1) Grandmother and Matthew met Mother at Grandparents' rental house to remove Mother's personal possessions on March 6, 2019; (2) Grandmother took the Children to see Mother at her workplace on March 25, 2019; (3) Mother took Zayne to the flea market on April 21, 2019; and (4) Mother saw both the Children at Zayne's birthday party on June 1, 2019. Grandmother noted that only one of these visits lasted longer than three hours. Furthermore, Grandmother explained that Mother would stay for a few hours on holidays and birthdays but that other visits would last "just not long at all." According to Grandmother, Mother made only one request to see the Children during the Determinative Period. Moreover, the documentary evidence presented by Mother fails to support her alleged number of visits, instead indicating that she visited the Children only on March 6, 2019; March 25, 2019; and June 1, 2019.

In an effort to bolster her credibility, Mother has cited *In re Keri C.*, 384 S.W.3d 731, contrasting her testimony about her visits with the mother's testimony in *In re Keri*

*C.* According to Mother, she was "certain of each visit she was able to have with her children," whereas the mother in *In re Keri C.* was "'not for sure' whether she had any . . . visits in September 2007." *See In re Keri C.*, 384 S.W.3d at 740. However, our review of the evidence presented at trial demonstrates that Mother was uncertain how many visits she had during the Determinative Period, which further supports the trial court's credibility determination. Mother did not provide specific dates beyond the dated photos she entered into evidence, and she was equivocal about the number of visits for February 2019 and May 2019.

Significantly, the trial court determined Grandmother's testimony to be more credible than Mother's and cited Grandmother's list of visits in its oral and written findings when concluding that Mother had abandoned the Children by failing to visit. We will not second-guess the trial court's credibility finding. As this Court has previously stated:

> The credibility of witnesses is a matter that is peculiarly within the province of the trial court. That court has a distinct advantage over us: it sees the witnesses *in person.* Unlike an appellate court—which is limited to a "cold" transcript of the evidence and exhibits—the trial court is in a position to observe the demeanor of the witnesses as they testify. This enables the trial court to make assessments regarding a witness's memory, accuracy, and, most importantly, a witness's truthfulness. The cases are legion that hold a trial court's determinations regarding witness credibility are entitled to great weight on appeal. In the absence of unrefuted authentic documentary evidence reflecting otherwise, we are loathe to substitute our judgment for the trial court's findings with respect to the credibility of the witnesses.

*Lockmiller v. Lockmiller,* No. E2002-02586-COA-R3-CV, 2003 WL 23094418, at *4 (Tenn. Ct. App. Dec. 30, 2003); *see also Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary"). Giving proper deference to the trial court's credibility findings, we determine that the evidence does not preponderate against the trial court's finding that Mother had only visited the Children four times during the Determinative Period.[8]

Upon careful review, we agree with the trial court's determination that Mother's visits were token in nature. Considering the specific circumstances of this case, four visits during the Determinative Period were of such an infrequent nature as to fit the statutory definition of "token visitation." *See In re Keri C.*, 384 S.W.3d at 750-51 (concluding that

---

[8] Because two of these four visits were with only one child and not both, Mother only visited with each child three times. The March 6, 2019 visit was solely with Matthew. The April 21, 2019 visit was only with Zayne. The March 25, 2019 and June 1, 2019 visits were with both of the Children.

the record contained clear and convincing evidence that the mother's visitation with the child was token when she only visited four times during the determinative period); *see also In re Jayvien O.*, No. W2015-02268-COA-R3-PT, 2016 WL 3268683, at \*6-7 (Tenn. Ct. App. June 7, 2006) (concluding that four visits during the determinative period constituted token visitation). Considering that the trial court credited Grandmother's testimony regarding the number and duration of visits, we find no error in the trial court's conclusion that Mother's visitation during the Determinative Period was token in nature.

We therefore conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother failed to engage in more than token visitation with the Children during the Determinative Period. The trial court did not err in terminating Mother's parental rights to the Children based upon this statutory ground.

### B. Abandonment by Failure to Support

Statutory abandonment can also be based on a parent's failure to financially support a child, which occurs when a parent, "for a period of four (4) consecutive months, [fails] to provide monetary support or . . . more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Support is considered "token" when "the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). An adult parent is presumed to know that he or she has a duty to provide support. Tenn. Code Ann. § 36-1-102(1)(H); *see also In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017) ("[I]t is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place").

A parent may assert, as an affirmative defense, that the failure to provide financial support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). However, the parent bears "'the burden of proof that the failure to . . . support was not willful' and must establish the lack of willfulness by a preponderance of evidence." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*8 (Tenn. Ct. App. July 22, 2020) (quoting Tenn. Code Ann. § 36-1-102(1)(I)). "Failure to support is willful when a parent is aware of the duty to support and has the ability but makes no attempt to provide support and has no justifiable excuse for failure to do so." *In re Mattie L.*, 618 S.W.3d at 345.

In its final orders, the trial court repeated its findings that Mother had not paid any financial support during the Determinative Period. The trial court also stated in its written orders that Mother's claim that she did not know she had a legal obligation to provide support to the Children was unavailing given that parents over the age of eighteen are presumed to be aware of this duty.

Although Mother's argument primarily centers on the trial court's finding that she abandoned the Children by failing to visit, Mother further contends in her appellate brief

- 28 -

that Grandparents prevented her from financially supporting the Children. At trial, Mother testified that every time she "called or spoke to [Grandparents] in person," they told her that they had "everything taken care of" and that they did not need help. Claiming that Grandparents had refused Mother's offer to assist financially with the Children, Mother also testified that she would give Zayne between ten and fifty dollars every time she visited with him.

In contrast, Grandmother testified that Grandparents had never refused financial assistance from Mother, stating: "We would not turn any help down from anybody" and "We've taken it from anybody that's offered." Grandmother explained that she had never told Mother that they did not need assistance and that, in fact, they could have used help. When questioned regarding whether Grandparents had received any type of support, including "school supplies, formula, clothes, or any other type of any kind of support or cash or check or money order" from Mother, Grandmother responded that they had received no support during the Determinative Period, with the exception of Mother's gift and money for Zayne's birthday on June 1, 2019. Other than birthday and Christmas gifts for the Children, Grandmother identified only one time outside the Determinative Period when Mother offered to contribute to the expenses of raising the Children. According to Grandmother, in January 2019, Mother inquired whether they needed anything for the Children, and Grandmother responded with a list, which included diapers and formula for Matthew and pants and shirts for Zayne. Grandmother added that although Mother indicated she did not have much money, she ultimately provided four cans of formula and ten jars of baby food for Matthew and a pair of underwear for Zayne.

Although the trial court did not make a specific finding with regard to Mother's allegation that Grandparents had refused her offers of support, the court did determine that Mother's claim of ignorance of her duty to pay support was not an affirmative defense. In addition, the trial court credited Grandmother's testimony, which included Grandmother's denial that Grandparents had refused any financial assistance from Mother. We determine that the evidence presented at trial preponderates in favor of the trial court's finding, by clear and convincing evidence, that Mother failed to provide financial support during the Determinative Period and failed to establish an affirmative defense regarding this statutory ground.

Although Grandmother and Mother both testified that Mother had provided Zayne with a birthday gift and money, and Mother presented evidence that she had sent Zayne ten dollars for Valentine's Day, we determine that these gifts amounted to token support. *See In re Braxton M.*, 531 S.W.3d at 721 (affirming the trial court's finding that Christmas gifts given during the determinative period, as well as some articles of clothing, constituted nothing more than token support). In addition, the trial court properly concluded that Mother's statements that she was unaware of her duty to provide support constituted no defense to her failure to do so because adult parents are presumed to know of this duty.

*See In re Archer R.*, No. M2019-01353-COA-R3-PT, 2020 WL 820973, at *7 (Tenn. Ct. App. Feb. 19, 2020) ("[T]he legislature presumes a parent who is at least eighteen years old is aware of his or her obligation to support his or her child, regardless of whether a court has entered an order requiring child support to be paid." (citing Tenn. Code Ann. § 36-1-102(1)(H))).

Considering that Mother testified that she had obtained and maintained employment since November 2018 and had been earning $250.00 per week, we find that she was capable of making some type of reasonable payment of support for the Children. *See, e.g., In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *7 (Tenn. Ct. App. June 28, 2018) (determining that a parent's income of $800 per month evinced her ability to pay child support); *In re Brantley B.*, No. M2016-02547-COA-R3-PT, 2017 WL 4877456, at *3 (Tenn. Ct. App. Oct. 30, 2017) (determining that a parent's income of $200 per week evidenced her ability to pay child support). Mother neither posited at trial nor in her brief on appeal that she was incapable of providing support. Furthermore, Tennessee Code Annotated § 36-1-102(D) provides: "That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." The trial court did not err in terminating Mother's parental rights based upon this statutory ground as well.

## VI. Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the Petitions were filed lists the following factors for consideration:[9]

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian

---

[9] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petitions in this case were filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d at 732.

from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis under the applicable set of statutory factors:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually

- 32 -

intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Mother's parental rights to the Children. In each of its final orders, the trial court made the following findings:

Whether the parent or guardian has made such an adjustment of circumstance, conduct, and conditions as to make it safe and in the child's best interest to be in the home of the guardian. The Court finds that [Mother] has made adjustments but the Court does not find that it's in the best interest of the child to be in her home.

Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not necessarily appear possible. This particular factor has not been shown in this case. It appears that [Mother] has been clean for twenty[-]five (25) months and there's no evidence to the contrary.

Whether the parent or guardian has maintained regular visitation or early contact with the child. The Court finds the few visits that took place in the four months before this petition was filed were token visits as that term is defined in the statute. The Court finds [Mother] initiated only one of those visits and the other three visits that took place were a result of invitations by [Grandmother] to [Mother] to celebrate birthdays and holidays in the home.

Whether a meaningful relationship has otherwise been established between the parent or guardian and the child. The Court finds that a meaningful relationship between [Mother] and the subject child has not been established.

The effect a change in caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition. The Court finds that removing the child from the home of their grandparents would be devastating and have a severe negative effect on their psychological, medical, and emotional condition.

Whether the parent or guardian or other persons residing with the parent or guardian has shown brutality, physical, sexual, emotional, or psychological abuse or neglect toward the child or another child or adult in the family or household. The Court finds there's absolutely no evidence whatsoever of any of that happening in this case or even an allegation that any of that took place.

Whether the physical environment of the parent[] or guardian's home is healthy and safe, whether there's criminal activity in the home and whether there's such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner. The court finds this factor has not been proven. There's no evidence of any of that behavior taking place at this time in [Mother's] home.

Whether the parent or guardian's mental or emotional status would be detrimental to the child to prevent the parent or guardian from effectively providing safe and stable care and supervision for the child. It appears to the Court that [Mother] is doing well now. This particular factor is not relevant to this case.

Whether the parent or guardian has paid child support. The Court finds that [Mother] has failed to provide any support for the subject child.

The Court finds that it is in the best interest of the subject child that the parental rights of [Mother] be terminated.[10]

(Paragraph numbers omitted.)

Mother posits that the trial court's best interest determination was unsupported by clear and convincing evidence. In stating this contention, Mother presents many of the same arguments she raised against the trial court's findings that Mother had statutorily abandoned the Children. Mother argues that the trial court made its decision "based partly on a finding that [Grandparents'] testimony was more credible than Mother's."

---

[10] The trial court's best interest findings in its order terminating Mother's parental rights to Zayne are identical to its best interest findings in its order terminating Mother's parental rights to Matthew.

Specifically, Mother argues that Grandparents' "refusal to acknowledge the reality of Mother's improved situation" lends credibility to Mother's testimony that Grandparents refused to allow consistent visits with the Children and refused Mother's offers of support. However, as stated previously, we afford proper deference to the trial court's credibility determinations. *See Jones*, 92 S.W.3d at 838.

Furthermore, the record belies Mother's argument in this regard. Grandfather testified that Mother had changed her life and quit using drugs, giving Mother credit for her improved situation. Notwithstanding, upon review of the trial court's orders, we determine that any testimony from Grandparents that could be construed as minimizing Mother's change in circumstances did not impact that trial court's findings. The trial court referenced and noted Mother's "tremendous progress" and weighed two factors in favor of the retention of her parental rights based on the adjustments she had made in her life.

Mother again stresses that Grandparents refused to allow her to see the Children in contending that the trial court erroneously weighed factor four (whether a meaningful relationship has otherwise been established between the parent or guardian and the child) in favor of terminating Mother's parental rights. Mother specifically argues that her "inability to bond is due to the same refusal by Petitioners to allow Mother to have sufficient time to establish her own bond . . . ." Inasmuch as we have previously concluded that Mother failed to prove her allegation that Grandparents prevented her from visiting the Children, we also find her argument that Grandparents prevented her from bonding with the Children unpersuasive. Mother visited each child a total of three times during the Determinative Period. Grandmother described Mother as "somebody that [Matthew] does not know," and the GAL noted that Zayne had "barely mentioned" Mother in her interview with him. As such, the trial court did not err in concluding that no meaningful relationship between Mother and the Children had been established.

Mother also urges that the trial court erred by weighing factor five (the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition) in favor of terminating her parental rights. In support of her position, Mother cites *In re Adoption of A.M.H.*, in which this Court concluded: "Evidence that A.M.H. will be harmed from a change in custody because she has lived and bonded with the [guardians] during the pendency of the litigation does not constitute the substantial harm required to prevent the parents from regaining custody." 215 S.W.3d at 797. However, the trial court did not predicate its weighing of this factor solely on the number of years the Children had resided with Grandparents.

The trial court noted that Zayne was "flourishing" under Grandparents' care and custody and that Grandparents were the only parents Matthew had ever known. *See In re Addalyne S.*, 556 S.W.3d 774, 794 (Tenn. Ct. App. 2018) (concluding that a change in caretakers would have a negative effect on the child because her grandparents had raised her since she was born and provided her with a "stable, loving home, as well as financially

support[ing] her"). In addition, Grandmother's testimony indicated that Zayne was thriving in their care—in school, with friendships, with his many extracurricular activities, and in the therapy that Grandparents had arranged for him. We conclude that the evidence presented at trial supported the court's finding that a change in caretakers and physical environment would have a "devastating" impact on the Children.

Apart from repeating her arguments with reference to Grandmother's credibility, Mother primarily asserts that the trial court should have afforded her improvement and adjustment of circumstances, conduct, and conditions sufficient significance such that this factor would have outweighed all other factors weighing in favor of terminating her parental rights. However, the trial court had no obligation to assign such weight to Mother's progress, particularly when the evidence presented at trial indicated that Mother maintained no meaningful relationship with the Children. *See In re Addalyne S.*, 556 S.W.3d at 795 ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor . . . ."); *see also In re Terry S.C.*, No. M2013-02381-COA-R3-PT, 2014 WL 3808911, at *18 (Tenn. Ct. App. July 13, 2014) (concluding that "perhaps most importantly, [the mother] has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them"). Here, Mother failed to establish a meaningful relationship with the Children by failing to visit with them regularly. This significant fact, in conjunction with the trial court's determination that Mother had failed to visit and provide support and that a change of caretakers would be devastating for the Children, clearly supports the trial court's conclusion that the best interest of the Children would be served by terminating Mother's parental rights.

Based on our careful review of the evidence, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. Having also determined that statutory grounds were established by the same standard of proof, we affirm the trial court's termination of Mother's parental rights to the Children.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's final orders terminating Mother's parental rights in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's orders terminating Mother's parental rights to the Children and collection of costs assessed below. Costs on appeal are assessed to the appellant, Brittney R.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE

- 36 -